**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------

**CLASSIC MARITIME INC.,**

          **Plaintiff,**        **08 Civ. 11129 (JGK)**

      **- against -**               **OPINION AND ORDER**

**LIMBUNGAN MAKMUR SDN BHD,**
**LION DIVERSIFIED HOLDINGS BERHAD,**
**and LION DRI SDN BHD,**

          **Defendants.**
------------------------------------

**JOHN G. KOELTL, District Judge:**

Two of the named defendants, Lion Diversified Holdings Berhad ("Lion") and Lion DRI SDN BHD ("Lion DRI"), move pursuant to Rule E(4)(f) of the Supplemental Rules of Certain Admiralty and Maritime Claims to vacate an order of maritime attachment issued by this Court on January 30, 2009. On January 29, 2009, the plaintiff, Classic Maritime Inc. ("Classic"), filed an amended verified complaint against Limbungan Makmur SDN BHD ("Limbungan"), Lion, and Lion DRI (collectively, the "defendants"), seeking an ex parte order of attachment in the amount of $20,457,047.72 in aid of a civil action filed in the Commercial Court of England for Limbungan's alleged breach of a contract of affreightment (the "Amended Complaint"). In the Amended Complaint, the plaintiff alleged that Lion agreed to guarantee Limbungan's performance under that contract and that Lion DRI is Limbungan's alter ago. The Court reviewed the

Amended Complaint and the supporting papers and, after determining that the conditions of Supplemental Rule B appeared to exist, entered an order authorizing process of maritime attachment and garnishment against the assets of Limbungan, Lion, and Lion DRI (the "Attachment Order"). On or about February 19, 2009, a garnishee bank restrained funds of Lion DRI in the amount of $12,904,631.81.

For the reasons discussed below, the defendants' motion to vacate the Attachment Order is **denied.**

**I.**

Rule E(4)(f) provides that "[w]henever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." In order to obtain an attachment, apart from satisfying the filing and service requirements of Rules B and E, the plaintiff bears the burden of showing that "1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 445 (2d Cir. 2006);

2

Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd., 475 F. Supp. 2d 275, 278 (S.D.N.Y. 2006).  The Court must vacate an attachment if the plaintiff fails to sustain its burden of demonstrating that the requirements of Rules B and E are satisfied.  Aqua Stoli, 460 F.3d at 445.

Under the heightened pleading standard of Supplemental Rule E(2)(a), conclusory allegations are insufficient to support a claim of alter ego liability.  Dolco Invs., Ltd. v. Moonriver Dev., Ltd., 486 F. Supp. 2d 261, 272 (S.D.N.Y. 2007).  However, a plaintiff need not prove that the facts alleged in the complaint are true, but rather need only "demonstrate that 'reasonable grounds' exist for the attachment."  Wajilam Exports, 475 F. Supp. 2d at 278-79.  In determining whether the plaintiff has met this burden, a district court may consider evidence outside of the pleadings.  SPL Shipping Ltd. v. Gujarat Cheminex Ltd., No. 06 Civ. 15375, 2008 WL 4900770, at *1 (S.D.N.Y. Sept. 10, 2008) (citing Williamson v. Recovery Ltd. P'ship, 542 F.3d 43, 53 (2d Cir. 2008)); Wajilam Exports, 475 F. Supp. 2d at 278-79.

## II.

The following facts, taken from the Amended Complaint and the affidavits and other submitted papers, are undisputed unless otherwise indicated.

Classic is a business entity organized and existing under the laws of Monaco with its principal place of business in Monaco. (Am. Compl. ¶ 2.) Limbungan, Lion, and Lion DRI are business entities organized and existing under the laws of Malaysia and share a place of business at a single address in Kuala Lumpur, Malaysia. (Am. Compl. ¶¶ 3-5.) Lion DRI acquired Limbungan in May 2008 for a nominal cash consideration and, according to its 2008 Annual Report, has a 100% equity interest in Limbungan. (Am. Compl. ¶¶ 39, 45.)

In the Amended Complaint, Classic alleged that Limbungan was "drastically inadequately capitalized" in that its total capital as of January 23, 2009 was $0.55. (Am. Compl. ¶¶ 40, 49.) It also alleged that Lion DRI and Limbungan shared two officers and one director. (Am. Compl. ¶ 48.) Classic also submitted documentation from the Companies Commission of Malaysia showing that Lion DRI and Limbungan share the same registered address. (Am. Compl. ¶ 47.) Classic also submitted a remittance confirmation indicating that, on November 24, 2008, DRI made a payment on behalf of Limbungan on the first contract of affreightment (the "First COA") at issue in this case. (Am. Compl. ¶ 42 & Ex. 7.)

On or about July 29, 2008, Classic, as disponent owner, and Limbungan, as charterer, entered into the First COA for the carriage of certain cargos of iron ore pellets from Brazil to

4

Malaysia.  (Am. Compl. ¶ 7.)  This contract was memorialized in a fixture recap,[1] which stated:  "The performance of Limbungan Makmur to be fully guaranteed by Lion Industries Corporation Berhad and a performance guarantee notarized and signed by an authorized signatory to be issued."  (Am. Compl. ¶ 30 & Ex. 1.)

On or about August 13, 2008, Classic and Limbungan entered into a second contract of affreightment (the "Second COA") whose terms were essentially identical to those of the First COA, except for different freight rates and loading dates.  (Am. Compl. ¶¶ 8-9.)  This contract was also memorialized in a fixture recap, which provided specific freight rates and loading dates for the Second COA, but which otherwise stated:  "All further terms/details as per Classic Maritime/ Limbungan C/P Dated 29/07/2008."  (Am. Compl. ¶ 10 & Ex. 2.)

Lion entered into two guarantees drafted by Classic, both dated August 28, 2008, "[i]n order to induce [Classic] to enter into" the First and Second COAs.  (Am. Compl. Ex. 5; Decl. of Ee Beng Guan ("Guan Decl.") Exs. A, B.)  The two guarantees are virtually identical, except for the references to the two different COAs.  (Guan Decl. Exs. A, B.)  Under both guarantees, Lion guaranteed and promised "to pay [Classic], on demand, any

---

[1] "A 'fixture recap' is recognized throughout the shipping industry as an agreement to a charter party's essential terms."  BS Sun Shipping Monrovia v. Citgo Petroleum Corp., 509 F. Supp. 2d 334, 343 (S.D.N.Y. 2007) (citing U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd., 241 F.3d 135, 146 (2d Cir. 2001)).

5

and all amounts (the "Obligations") that [Limbungan] becomes obligated to pay to [Classic] as a result of [Limbungan's] failure to perform its obligations or otherwise under the Charterparty when each of the Obligations becomes due . . . ." (Guan Decl. Exs. A, B.)  Both guarantees also state that each guarantee "is . . . a guarantee of payment and not of collection . . . ."  (Guan Decl. Exs. A, B.)  The guarantees further state: "The Guarantor's obligations under this guarantee are independent of [Limbungan's] obligations under the Charterparty.  The Counterparty may bring and prosecute separate actions against [Classic] and the Guarantor or may join the Guarantor and [Limbungan] in one action."  (Guan Decl. Exs. A, B.)

On or about September 30, 2008, Limbungan notified Classic that it wanted to postpone two of the four 2008 shipments due under the Second COA until 2009, and that it nominated the loading dates for the remaining 2008 shipments for November 15-24, 2008 and November 26-December 5, 2008.  (Am. Compl. ¶ 19.)  Classic agreed to the postponements under the condition that the two 2008 shipments be nominated in accordance with the terms of the Second COA.  (Am. Compl. ¶ 19.)

Pursuant to the Second COA, Classic nominated two vessels for the 2008 shipments, but Limbungan did not approve the nominations within two working days as was required under the Second COA.  (Am. Compl. ¶¶ 20-21.)  Limbungan subsequently

6

informed Classic that it would be unable to provide cargo for those two 2008 shipments. (Am. Compl. ¶¶ 22-23 & Ex. 4.) Classic alleges that it was damaged by Limbungan's breach of the Second COA in the amount of $18,366,330.50. (Am. Compl. ¶ 28.)

In connection with its motion to vacate, the defendants submitted a declaration from Cheng Yong Kim ("Kim"), a director of both Lion and Lion DRI, asserting that Limbungan and Lion DRI are both subsidiaries of Lion with separate corporate existences, separate books and records, and unique and separate profit centers. (Decl. of Cheng Yong Kim ("Kim Decl.") ¶¶ 12, 14.) Kim also states that Limbungan and Lion DRI file their taxes separately, that they do not share common or overlapping stock ownership, that Lion DRI does not hold or use the assets of Limbungan as its own, and that Lion DRI has strictly arms-length dealings with Limbungan and observes corporate formalities. (Kim Decl. ¶¶ 13, 15-18.) However, Kim concedes that the two companies share the same address, that they share two officers and a director, and that Limbungan did not file its own Annual Report for the year ending June 30, 2008, but that its financial performance was reported in the consolidated financial accounts of Lion and Lion DRI. (Kim Decl. ¶¶ 19-21.)

Classic submitted an attorney affirmation appending additional material supporting its alter ego claim. One of these documents is a bond circular issued by Lion, stating in a

7

section entitled "MATERIAL LITIGATION, CLAIMS AND ARBITRATION": "By a guarantee dated 30 September 2008, [Lion] had guaranteed the performance of [Limbungan] under the [Second COA]." (Decl. of James Hohenstein ¶¶ 3-6 & Ex. 3 at 6.)  Classic also submitted an affidavit from Jacob Fentz, the president of Classic.  (Decl. of Jacob Fentz ("Fentz Decl.") ¶ 1.)  Fentz explains that the performance guarantee was a key term discussed during the negotiations over the First COA, particularly given the low capitalization of Limbungan.  (Fentz Decl. ¶ 10 & Ex. 2.)  Fentz also alleges that upon revisiting his records, he discovered that Lion DRI had in fact made four payments totaling $11,532,878.36 on behalf of Limbungan under the First COA.  (Fentz Decl. ¶ 27 & Ex. 13.)  In a supplemental declaration, Kim explains that the four payments made by Lion DRI on behalf of Limbungan all related to one transaction under the First COA, and that Lion DRI made the payment because it was the ultimate receiver of the freight.  (Supp. Decl. of Cheng Yong Kim ¶¶ 12-13.)

### III.

The defendants move to vacate the Attachment Order on two grounds.  First, the defendants argue that Classic has no valid prima facie maritime claim against Lion because the guarantee issued in connection with the Second COA was not a maritime

8

contract.  Second, the defendants argue that Classic has no valid prima facie maritime claim against Lion DRI because Lion DRI is not an alter ego of Limbungan.  The defendants also raised additional arguments in their opening memorandum, which the plaintiff opposed, but then dropped these arguments in its reply memorandum.  These arguments are thus deemed abandoned, see Carlisle Ventures, Inc. v. Banco Espanol de Credito, S.A., 176 F.3d 601, 609 (2d Cir. 1999), and in any event, the Court finds them to be without merit.  The Court now turns to the first of the defendants' two remaining arguments, namely, that the guarantee issued by Lion in connection with the Second COA was not a maritime contract because it did not guarantee Limbungan's performance.

**A.**

It is well-established in this Circuit that while an agreement to guarantee the performance of a maritime contract is maritime in nature, see, e.g., Compagnie Francaise de Navigation a Vapeur v. Bonnasse, 19 F.2d 777, 779 (2d Cir. 1927) (L. Hand, J.); an agreement "as surety 'to pay damages for another's breach of a maritime charter is not' a maritime contract," Fednav, Ltd. v. Isoramar, S.A., 925 F.2d 599, 601 (2d Cir. 1991) (quoting Kossick v. United Fruit Co., 365 U.S. 731, 735 (1961)); Interocean Shipping Co. v. Nat'l Shipping & Trading Corp., 462

F.2d 673, 678 (2d Cir. 1972); see also C. Transport Panamax, Ltd. v. Kremikovtzi Trade E.O.O.D., No. 07 Civ. 893, 2008 WL 2546180, at *2 (S.D.N.Y. Jun. 19, 2008).  However, "[t]he fact that the principal's primary obligation of performance is itself the payment of money does not . . . remove the 'maritime flavor' from the obligation."  Mercator Line, Inc. v. Witte Chase Corp., No. 88 Civ. 8060, 1990 WL 52254 (S.D.N.Y. Apr. 18, 1990).  Where the payment of money is itself the performance of a maritime obligation, courts have also found such guarantees to be maritime contracts.  See, e.g., Compagnie Francaise, 19 F.2d at 779 (bond securing ship's contribution for damaged cargo); C. Transport, 2008 WL 2546180, at *2 (guarantee of charter including the payment of demurrage); Deval Denizcilik ve Ticaret A.S. v. Agenzia Tripcovich S.R.L., 513 F. Supp. 2d 6, 9 (S.D.N.Y. 2007) (guarantee of payment to prevent counterparty from exercising lien on cargo); see also Mercator Line, 1990 WL 52254, at *4 (holding that claim for demurrage and interest was maritime where liability arose under guarantee of performance); but cf. Black Sea State Steamship Line v. Ass'n of Int'l Trade Dist. 1, Inc., 95 F. Supp. 180, 182 (S.D.N.Y. 1951) (holding that guarantee to cover demurrage until party to charter posted bond was not maritime).

Classic asserts that the Second COA incorporated a performance guarantee, evidenced by the language of the second

10

fixture recap adopting "[a]ll further terms/details as per Classic Maritime/ Limbungan C/P Dated 29/07/2008." Because the First COA contained a performance guarantee, Classic's argument goes, so did the Second COA, according to the terms of the second fixture recap. The problem with this argument, however, is that this is not quite what either guarantee actually says. The guarantees make clear that they guaranteed payment only, and nothing in the guarantees indicate that Lion promised to undertake any of Limbungan's obligations under the charterparty that involved anything more than payment. Thus, despite the use of the term "performance guarantee" in the first fixture recap and the second fixture recap's adoption of the terms of the First COA, neither guarantee was a guarantee of full performance of Limbungan's obligations.

That does not end the inquiry, however. Classic argues that the fact that the guarantee issued in connection with the Second COA was for payment only is not enough to remove the "maritime flavor" from the obligation because, according to Classic, it assumed some of Limbungan's obligations under the charterparty. Indeed, the second guarantee states that Lion guaranteed and promised "to pay [Classic], on demand, any and all amounts . . . that [Limbungan] becomes obligated to pay to [Classic] as a result of [Limbungan's] failure to perform its obligations or otherwise under the Charterparty when each of the

11

Obligations becomes due . . . ." (Guan Decl. Ex. B). The guarantee further provided that it was "a guarantee of payment and not of collection." Had the second guarantee only provided that Lion would pay in the event of breach, the agreement might have been in the nature of a surety and not a guarantee. However, the second guarantee did in fact provide that Lion would undertake Limbungan's obligations to pay any amounts due under the charterparty if Limbungan did not pay them when the obligations were due. This is enough to render the guarantee maritime in nature. See C. Transport, 2008 WL 2546180, at *2; Mercator Line, 1990 WL 52254, at *4. Because Classic has a valid maritime claim against Lion, the defendants' motion to vacate the attachment with respect to Lion is **denied**.

**B.**

To determine whether a company is the alter ego of another, courts in this Circuit consider many factors, including:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

12

MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 63 (2d Cir. 2001).  The determination of alter ego liability is a fact-intensive inquiry.  Id.

The defendants' arguments that Lion DRI is not the alter ego of Limbungan are meritless.  Classic provided ample factual allegations in its Amended Complaint to support a prima face admiralty case based upon alter ego liability, and the additional evidence Classic has submitted in opposition to the motion to vacate is even more compelling.  Classic has submitted evidence that: (1) Limbungan is a subsidiary of Lion DRI; (2) Lion DRI has the ability to control the finances and operations of Limbungan; (3) Limbungan is severely undercapitalized; (4) Limbungan and Lion DRI have two common officers and one common director; (5) Limbungan and Lion DRI have a common address, telephone number, fax number, email address, and website; and (6) Lion DRI has made at least four payments of the debts of Limbungan of a total sum of over eleven million dollars on Limbungan's behalf.

Evidence of substantial undercapitalization, as in this case, is significant because it can be evidence of a company's lack of independent substance.  See, e.g., Maritime Ventures Int'l v. Caribbean Trading & Fidelity, Ltd., 689 F. Supp. 1340, 1349 (S.D.N.Y. 1988).  Evidence of the payment of debts on behalf of a company, as in this case, can also be significant

13

evidence of an alter ego relationship because it evidences control and a lack of regard for corporate formalities.  See, e.g., Ulisses Shipping Corp. v. FAL Shipping Co. Ltd., 415 F. Supp. 2d 318, 325-26 (S.D.N.Y. 2006), overruled on other grounds by Aqua Stoli, 460 F.3d at 446 n.8.

The allegations in the Amended Complaint, together with the additional evidence, are sufficient to provide reasonable grounds to support alter ego liability for Lion DRI.  See, e.g., Hanjin Overseas Bulk Ltd. v. CPM Corp. Ltd., No. 08 Civ. 9516, 2008 WL 5429640, at *4 (S.D.N.Y. Dec. 22, 2008) (finding sufficient evidence of alter ego relationship where company repeatedly paid debts of the defendant, the company and the defendant shared the same address, the defendant was undercapitalized, and business email address of company was the personal email address of a director and shareholder of the defendant); Goodearth Maritime Ltd. v. Calder Seacarrier Corp., No. 08 Civ. 2028, 2008 WL 2856533, at *2 (S.D.N.Y. July 21, 2008) (holding that evidence that defendants shared a common address and phone, one company was described as a "paper company," the companies may have shared common principals, and one defendant may have acted as a "paying agent" for the other was sufficient to state prima facie claim of alter ego liability); C. Transport Panamax, 2008 WL 2546180, at *4 (finding sufficient evidence of alter ego liability where

14

plaintiff alleged that one defendant was owned by the other defendant, they had overlapping directors and officers, they had parallel internet presences, and one defendant made a single payment on behalf of the other); <u>Wilhelmsen Premier Marine Fuels AS v. UBS Provedores Pty Ltd.</u>, 519 F. Supp. 2d 399, 410 (S.D.N.Y. 2007) (finding sufficient evidence of alter ego relationship where one defendant had paid an invoice for another defendant, defendants shared common addresses, telephone numbers, email addresses, principals, and intermingled advertising, and defendant was insufficiently capitalized).

The proof of an alter ego relationship between Limbungan and Lion DRI in this case is far stronger than in <u>SPL Shipping</u>, 2008 WL 4900770, at *3, on which Lion DRI relies, where the plaintiff's assertion that one defendant had paid the debt of another defendant was the only fact that the plaintiff had asserted in support its alter ego claim.  Here, where Classic has shown inadequate capitalization; overlap in officers and directors; common office space, addresses, and websites; control by Lion DRI over Limbungan; and four separate payments of Limbungan's debts by Lion DRI; it has easily satisfied the requirements of a prima facie case of alter ego liability.  The defendants' motion to vacate the attachment with respect to Lion DRI is therefore **denied**.

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed they are either moot or without merit. Therefore, the defendants' motion to vacate the attachment against Lion and Lion DRI is **denied**.

SO ORDERED.

Dated:   New York, New York
         April 13, 2009

_____
John G. Koeltl
United States District Judge

16